OPINION OF THE COURT
Stanley Gartenstein, J.
In this prosecution, the court is called upon to extend by interpolation a procedural remedy now available by virtue of judicial stare decisis in felony prosecutions in the court of *2 superior criminal jurisdiction to their transitional phases within a local criminal court (in this instance, the New York City Criminal Court). We hold as a matter of law that a prepleading investigation is available in a local criminal court in a felony matter whose ultimate disposition will necessarily fall exclusively within the jurisdiction of a superior criminal court.
Notwithstanding the significance of this holding of apparent first impression it palls in the face of rage generated by the callousness of a society which can strip one human being’s dignity to the point of desperation evinced by the defendant simply by ignoring his existence.
Defendant Anthony Spagna is 80 years old and has never been arrested. His last remaining relatives and friends died five years ago. Until his arrest, he lived totally alone and forgotten in a rundown cold-water tenement on the Lower East Side. When the undersigned appeared at Bellevue Hospital to arraign him from his hospital bed, his not guilty plea was entered by assigned counsel for a bewildered client who knew only that he hurt and wanted to die. The underlying arrest came about on New Year’s Eve when the temperature and wind-chill factors plunged to record lows. Unable to obtain heat, having nowhere to turn, Mr. Spagna lit a small fire on the bare floor of his sparse apartment, which burned through the floor. He was huddled in his bed shivering when taken into custody. He has been housed at Bellevue Hospital since arrest and arraignment with nowhere to go. Indeed, the only component of society to which he is not an unpleasant reinforcement of its callousness toward the aging is the criminal justice system. Both his arrest by the fire marshal and subsequent prosecution by the District Attorney are admittedly acts of compassion designed solely to provide some roof over his head until a facility may be found for him. At that time, the People have indicated that their stance will be a motion to dismiss in the interests of justice.
Because of the intransigence of a system which must bend the individual to its peculiarities on the one hand, and its inadequacy of facilities on the other, the only instrumentality whereby Mr. Spagna could be somewhat assured of a safe place to stay temporarily was an order *3 pursuant to CPL article 730 remanding him for mental examination to determine competency with an auxilliary direction that he be housed at the hospital during its pendency. The other two alternatives, parole when defendant has no one to whom he can turn; or detention in default of bail, at Rikers Island, housed with all other inmates, were both obviously out of the question. To be sure, this directive was stop-gap at best; a wish to die does not render one incompetent under article 730. Even with this order in effect, defendant has been housed at Bellevue Hospital instead of Rikers Island pending a perfunctory psychiatric examination only as a result of the joint personal intervention of the Assistant District Attorney, defense counsel, and the court itself. Even this arrangement, which is the best option available, requires that Mr. Spagna be hospitalized in the prison ward under maximum security, and is obviously inappropriate. To satisfy the massive systemic conglomerate resulting from the negotiated interaction between Criminal Justice, Corrections, Social Services and Mental Hygiene, the only possible procedure available to effectuate defendant’s residence at the hospital out of a prison setting is a psychological examination as part of a prepleading investigation, heretofore unknown in felony matters during their transitional phase in the local criminal court.
To coin a phrase with necessity lighting the way to invention, we now consider the availability of this procedure upon joint application of opposing counsel.
The very existence of a prepleading investigation, let alone its availability in a particular case was, to all intents and purposes, unknown until a dictum in People v Selikoff (35 NY2d 227, 239) in which it was mentioned in passing for the limited purpose of binding all parties to a plea bargain arrangement in advance. Its general utility apparently stems from People v Crosby (87 Misc 2d 1079). In that matter the court ordered the Department of Probation to conduct a presentence investigation of the defendant notwithstanding the fact that there was as yet no adjudication of guilt. The patent framework of the enabling statute (CPL 390.20 et seq.) which clearly contemplated the condition precedent of an adjudication of guilt prior to entry of *4 any order of presentence investigation thereunder was temporarily overlooked by the court’s consideration of CPL 390.20 (subd 3) independently of those provisions surrounding it. Seizing on the anachronistic, perhaps coincidental absence of specific language in this subdivision such as would render it exclusively a postpleading statute, the court ordered a presentence investigation in advance of a plea. In doing so, it predicated an affirmative order on the lack of any statutory prohibition in the crucial subdivision and upon policy considerations, viz., the obvious advantages involved in giving both the People and defendant the wherewithal to assess the plea bargaining “value” of a case by eliminating one variable in the negotiating process, the Department of Probation’s required investigation and recommendation.
The Crosby court, placing emphasis on the plea bargaining process and the corresponding need to facilitate it, quoted People v Selikoff (35 NY2d 227, 233-234) in which Chief Judge Breitel underscored the importance of assessing a particular case’s bargained “value”:
“Plea negotiations, of course, serve many other needs. They relieve the prosecution and the defense too, for that matter, from ‘the inevitable risks and uncertainties of trial’ *** The negotiation process which results in a guilty plea telescopes the judicial process and the necessarily protracted intervals involved in charge, trial, and sentence, and even appeals, hopefully starting the offender on the road to possible rehabilitation * * * The process also serves significant goals of law enforcement by permitting an exchange of leniency for information and assistance ***
“Perhaps most important, plea negotiation serves the ends of justice. It enables the court to impose ‘individualized’ sentences, an accepted ideal in criminology, by avoiding mandatory, harsh sentences adapted to a class of crime or a group of offenders but inappropriate, and even Draconian, if applied to the individual before the court *** Obviously no two defendants are quite alike even if they have committed, in legal definition, identical offenses. The negotiation process often brings to light *5 mitigating circumstances unknown when the defendant was charged”.
When Crosby legitimatized this mutation for general use simply by asking “why not?” instead of “why?”, it admittedly did so for policy reasons at a juncture in the evolution of the common law when a new procedural tool whose time had come was needed. We extend its application to the transitional phases of a felony in the local criminal court for the same reasons. Obviously, the thrust of transitional jurisdiction in this court is the in personam submission of a defendant to its authority as to all matters relating to his person (bail, competency, line-up, etc.) until that point in the prosecution when by action of a Grand Jury, the superior court assumes it as an adjunct of its in rem. jurisdiction over the felony itself. If this reasoning holds true, there can be no more in personam proceeding than sentencing which is the prototype of the system’s response to an individual (Burns v United States, 287 US 216; Williams v New York, 337 US 241; Snyder v Massachusetts, 291 US 97; People v Johnson, 252 NY 387). Moreover, if the “value” of a felony is important prior to pleading in the superior court, it is certainly so in the Criminal Court where, possessed of this prepleading investigation and cognizant of all equities in favor of a defendant which a court would ultimately consider on sentence the People will be in a position to continue prosecution as a felony; to reduce the charges; to accept a lesser plea; or even to elect not to prosecute at all. In short, at this stage, the discretion vested in the prosecution is just as important as that of the court itself — and any device to facilitate its exercise should properly be available. In all events, the cost to the taxpayers of proceeding via complex Grand Jury presentation and resulting round robin of a new arraignment; new plea bargaining going over the same ground; motions, discovery proceedings; and numerous other duplications might be eliminated in a proper case. The key factor is information in advance. Finally, the real reason: The District Attorney’s, defense counsel’s, and the court’s concern over the overwhelming reality that were the competency examination as ordered to find defendant incapable of standing trial, he would automatically be transferred to *6 the Mid-Hudson facility housing the dangerous criminally insane where he would be torn apart within minutes of arrival. Cognizant that the State of New York has not seen fit to acknowledge the existence of this human being on the one hand, or, on the other to guarantee his safety, we, prosecutor, defense counsel and the court, have fully shared in the complicity of creating this device to save his life. We have done so openly and with pride in the fact that co-operation between the different segments of the legal profession which we represent can achieve this just result. If a much needed procedural remedy is thus created, so much the better.